Thank you. You may be seated. Good morning. We're so pleased to be back for in-person argument here in the en banc courtroom for the first time. Well, it's the second week because we had one at nine o'clock this morning, but the first day in almost a year. And we did this in order so that we could accommodate lawyers who wish to appear in person as opposed to on Zoom, although we're pleased to have Zoom arguments as well. But where we can safely proceed and where it's requested, you see we would like to offer that as well for the lawyers. You see we have plexiglass dividers and we're far apart and people are wearing masks. And it is just such a nice thing to be able to safely proceed in person. We also have little covers for the microphone and please use those. And we had individual check-in times and so many other safety precautions. If you are aware of any other safety precautions that you would suggest, I'm sure that you should alert the clerk's office because as this is new, we want to make sure we're pursuing every possible safety precaution that is appropriate for a courtroom. But having said that, I will call the next case. Thank you. 2020-20196, West African Ventures Limited, C-Trux Group, FZE versus Suntec's Capital Partners to GPLP. Mr. Heron? Is it Har-in instead of Heron? Heron. Har-in. No, you had it right the first time. Excuse me? Heron. Heron. Yes, ma'am. I said it right the first time. Yes, Your Honor. Okay. You may proceed with your argument, sir. Your Honors, and may it please the Court. I represent appellant Suntec's Capital Partners. Do you have the privilege to wear it or not as you prefer? Thank you, Your Honor. I'll be discussing the district court's ruling on subject matter jurisdiction for the first five minutes. My partner, Mr. Andrew Mead, will be discussing errors in the district court's summary judgment and findings of fact and conclusions of law for, I believe, thirteen minutes and then we'll reserve two minutes for rebuttal. Briefly, the facts. West African ventures or WAV and C-Trucks provide vessels and equipment for offshore oil and gas development in Nigeria. Non-party Ranger International signed contracts to lease some of these vessels and equipment for two projects, the Shell Project and the Con-Oil Project. Suntec's signed four guarantees, two for the, two with WAV and two with C-Trucks for the Con-Oil and the Shell Projects. WAV and C-Trucks allege that Ranger International failed to pay what was due and they now sue us as the guarantors. In the trial court, there was another guarantor, Ranger Offshore. They did not file a notice of appeal and are not proceeding here. So first, first a little background on the jurisdictional issue. Originally, plaintiffs' WAV and C-Trucks petition alleged that WAV was a corporation, but an exhibit to their petition said it was a limited liability company. So we argued that they, if it's a limited liability company, they didn't establish the, the citizenship of the members of the limited liability company, therefore they didn't establish the district court subject matter jurisdiction. That led to a few rounds of briefing and it turns out that Suntec's is a limited company, which is a Nigerian entity. So the, the issue is, does WAV take the citizenship of its place of incorporation and principal place of business, like a corporation, in which case it's a Nigerian citizen, or does WAV take the citizenship of all of its members, like basically any other type of entity? And if that's the case, we'll, we'll get to that later, but that means that they did not allege sufficient facts to invoke the district court's jurisdiction. Counsel, is it your position that the, the affidavit from the Nigerian attorney doesn't foreclose American citizenship for any of the entities in the LLC? I mean, you, you're, you're briefing it and I'm understanding your brief as though we're talking about an American limited liability company with, with members. Uh, if we do that, does the declaration or affidavit foreclose, uh, American citizenship? I, I don't believe it does. The affidavit says that WAV is a 100% Nigerian owned entity and if that means that WAV is owned by citizens of Nigeria who's domiciled in Nigeria, then if that's true, that would mean that, that they're a Nigerian company. If however, they're, they're owned by Nigerian citizens who say live in Houston because there, there's a large expatriate community in Houston, then that person would be for diversity jurisdiction purposes as a domiciliary of Houston, you'd be a, a, a Texas citizen and therefore that would defeat jurisdiction. And that's why this court has said that domi, that citizenship must be distinctly and affirmatively alleged and it can't be supplied by argument or inference. Uh, so far the, I believe 11th circuit and numerous district courts within this circuit have all held that in order to properly invoke the, the court's, the, the district court's jurisdiction, you don't just need to say, trust me, I'm a, I'm a Nigerian entity. You have to go through and allege the citizenship of every owner. So that way the, the court can see for itself, uh, who, what, what jurisdiction the, the party is a citizen of. Because otherwise it's just a, a conclusory affidavit that's, that there's no way to really test what it, what it means. So beginning in, I believe 1844, the U.S. Supreme Court found that a corporation could take the, the jurisdiction not of its owners, but of its locate, of its state of incorporation and principal place of business. By 1900, as new and newer and newer entities were being formed, the Supreme Court refused to extend this rule to those entities. It, it said, no, the, the, the corporation rule applies to corporations, not to, not to anything else. And I believe the Carden case explains this very well, that it talks about the quote, doctrinal wall that has only that so far under the Supreme Court jurisprudence has had one exception, and that is a Puerto Rican sociedad in Comandata. I'm, I apologize. My, my Spanish pronunciation is terrible. But in Carden, they said, there could be no doubt after Bolivni that at least common law entities, parentheses, and likely all entities beyond the Puerto Rican sociedad y Comandita take the citizenship of their owners unless they are a corporation. Okay. You need to wrap it up, counsel. If that, essentially we, we point to Carden as controlling here and foreclosing any possible exception to that rule. And as we discussed earlier, that they, they failed to allege the citizenship of the members. And if there are no other questions, I will, I will sit down. Thank you very much, Mr. Heron. Mr. Mead. Thank you, Judge and Honorable Court. I, I do truly appreciate being here. I think it's my first in-person argument in about a year. Thank you for providing that opportunity. I wanted to a little bit further address, Judge Englehart, your question, which was about the affidavit. And so, if you'll look at the district court's order on this issue, the district court held that because WAB was like a corporation, it didn't have to look behind the curtain at the citizenship or residency of the owners. That's a hundred percent, though. Isn't that the term used in the, in the declaration? So, in the declaration, it, so, so the first, yes, correct. But the first step of it was the judge didn't look at the declaration because the judge said this is like a corporation, so the citizenship doesn't matter. So, your, your question would be, had the judge said, I'm going to look to the residency because it's more like an LLC than a corporation, would the affidavit have foreclosed that? And so, there's two reasons why it wouldn't. One, Mr. Heron addressed, which is it's conclusory. You don't get to just say they're all, it's a hundred percent Nigerian-owned. But the other reason is that the actual burden of proof when you go to the, the court's holdings is you have to identify the owners. Really, that makes sense because we've got to be able to check. You can't just say it's a hundred percent Nigerian-owned. Is that one person? Is it a hundred people? To take a step further back, are you satisfied that a Nigerian LLC as a, an entity is of the same structure as what we here call an LLC? I think it's more like the, the limited company in Nigeria is more like a limited liability company in the United States, but also a little bit more like a partnership than it is a corporation. One of the reasons being the way that the share structure works is you can, you can have the, the limited company, the liability of the owners is limited either by a pledge or by a share ownership, which is more similar to a partnership and a general partnership structure. It's not really akin to a corporation or a limited liability company in the United States. And so I don't think that it's got a direct analogy in the U.S. And so the easy thing is what the Supreme Court has said, we've got a doctrinal law. You're either a and I'm going to try to pronounce, pronounce it because I don't have it written down. You're that one Puerto Rican entity that's ever been held to be an exception to the rule because of the fact that they are a, they're not a common law jurisdiction. But of course, Nigeria is a common law jurisdiction. Well, the district judge's opinion says WAV is an entity with legal personhood, perpetual existence governed by a board of directors with transferable shares. And thus it has attributes similar to a United States corporation. Uh, are any of those attributes incorrect that the judge cited here? Well, I don't know that, I don't know if they're incorrect because we don't have the, all of the documents to back up the legal structure of the entity, but they're also true of a limited liability company, right? If I looked at each of those elements, they would be true of an American limited liability company governed by a board or a manager governed by transferable shares. Um, Kenner Morgan enterprise products are publicly traded. And in fact, Kenner Morgan changed its entire corporate structure to become a ink instead of an LLC for this very reason, because it was subject to jurisdiction in all 50 states because of its ownership structure. So you can be a publicly traded limited liability company, but you're not a corporation, even though you've got a board of directors, easily transferable shares, limited liability of the owners. So simply holding that it's analogous to a corporation, the Supreme Court has said you either are a corporation or you are this one entity under Puerto Rican law because they're not a common law jurisdiction or you're outside the doctrinal wall. And so that's really, I think where the, the, where the district court got it wrong is the district court said, I'm going to look to find attributes that are similar to an American corporation and say, if it's got some of those, I'm going to say that it falls within, uh, the corporate review for jurisdiction rather than looking to see behind the curtain, whether the ownership structure would have met the, would have met the burden like a limited liability company. And so we're just painting that, that kind of absolute doctrinal wall that the U S Supreme Court has painted. Uh, but I really appreciate that question. I think it got right to the point. Uh, but assuming that there's jurisdiction, then we would have three other errors that the district court committed during the trial. And I think part of the problem with the district courts findings of fact and conclusions of law arises out of the way that the trial occurred and, and the timing between the trial and the findings of fact and conclusions of law, which is almost a year after the trial that the court, you know, normally in a jury trial, you'd have a verdict right like that. Um, but here it was almost a year or maybe even a little bit more than a year right on before the court issued the findings of fact and conclusions of law and then final judgment. And during that time, it appears that the court forgot that it had excluded the testimony of the expert witness on damages for WAP. And what happened was that the expert for WAP had prepared a report and I, I was the trial lawyer in the case and, and, and handling the appeal as well as Mr. Heron. And so when the expert prepared the report, they used the wrong numbers, uh, for the conversion rate of NYRA dollars to prepare the damages report. And so we waited until, till we were planning on waiting until trial. They apparently in prepping for trial noticed the issue and tried to supplement the expert report seven days prior to trial. We objected on the basis of prejudice and the district court found that there was prejudice and excluded the evidence, but allowed them to make a record by putting on the testimony anyway. Now, unfortunately, when the court went a year later to write the findings of fact and conclusions of law, the court cited directly to the evidence to the testimony that was put on simply to make an appellate record. And I didn't perform any cross examination because it was just a sort of bill of review type of, type of situation. And so the court directly cited to its paragraph 53 of the, of the findings of fact and conclusions of law as the only evidence to support the damages calculation was the excluded expert opinion to the dollar. Did the judge cite to the excluded report or did the judge perform his own mathematical calculation which, oh, by the way, was accurately reflected in the supplemental report that he had excluded? As I understood the supplemental report, it was to correct an error. The supplemental report was to correct an error which was the application of an incorrect conversion rate. Right. The judge directly cited to not the report in paragraph 53, but cited to the testimony at trial by the expert, Mr. Arney. That testimony, though, was simply for the appellate record, not for, and so we didn't cross examine him and we didn't offer any competing evidence. I have a question about that. Yes. When they were making their bill, you could have cross examined, couldn't you? Because you don't know for sure what's going to happen. They want to make a bill and the judge is going to, they're trying it for them, by themselves and so they can, you know, go back and reconsider. Did you have the chance to cross examination, to cross examine during the bill if you would wish to? I will say this, I don't recall, I remember, and I was trying to remember that this morning, I don't recall whether I had an opportunity to cross examine him at the time. I remember a discussion about it, but I don't recall whether I did. And I will say this, there are different ways that one might go about handling it on the fly during a trial, but I wasn't prepared to cross examine him on an issue that had been excluded. I cross examined him thoroughly on other issues and I thought very effectively. On this issue, because it had been excluded prior to the trial, I didn't have a cross examine outline. And what did you do when you discovered that the district court had relied upon this, what did you do then? Well, I think that what we did was we filed, I think that was when we got, I can't remember if we got a draft findings of fact and conclusions of law or if we got the final ones, but we got the citation in my rebuttal, I've got two minutes, and I figured I'd fill it up with answering questions I couldn't answer on the fly. But I'll get to that and I'll get you the citation of what we filed when we got that. But to follow up on Judge Englehart's, one of his other questions, couldn't the district court have just divided the six million by the 220 to get the proper exchange rate? Maybe those numbers aren't right, but you get the point. Possibly the court could have done that, although why would there be expert, I mean, first of all, I'd say this. You don't need an expert to do math, though. Well, yes, and experts do math at different levels. But a judge could do the math themselves. Sometimes. Sometimes math is so easy that a judge could do it. This is pretty easy math, isn't it? Right. Depends on the judge, right? Yeah, but this is pretty easy math. You're just dividing one number by another. And then applying, and then from that number applying other things like interest as the interest began to accrue and that sort of thing. Well, you multiply then the number you get by the interest rate. I know there's at least one person in the room who could do it and at least one who couldn't. Okay. So I'll say this. I don't know whether the answer is a correct calculation. Surely you do. I do not know. As you come here today, you probably, if you're not a math person, you've certainly asked a math person whether it's correct. Well, on that number, here's my issue. Is that the court, the way in which the plaintiffs decided to put on their case was through expert testimony. The court relied on the expert testimony. If the answer is the court surely could have performed the calculation on its own, then remand the case and let the court do that. Right? And do it the right way. The problem is on this record in front of you, what we have is the court relying on an expert opinion that the court excluded that somehow found its way back into the findings of fact and conclusions of law retroactively after the trial when I didn't have a chance to cross-examine them or have my own expert perform the calculation that, my apologies, I didn't and couldn't perform on my own, even if it is a relatively... I probably could have gotten an Excel spreadsheet and figured it out. But we didn't have that opportunity at trial. And it really surprised me to find a citation to excluded evidence coming up in the judge's findings of fact and conclusions of law. And it's to the dollar on Arnie's testimony. To the penny, actually, on the calculation. So you know that the court looked at that rather than... Well, the court says so. If you look at paragraph 53, the court says... Exactly. It's cited. It's across a citation to it. The court says, as Arnie testified at trial, the court forgot, as Arnie testified at trial for appellate purposes only because I exclude his opinion. Did you want to go over your other errors? Really quickly, I will. The other two that we had was that... And I think the foremost one... I'll take up the minute that I have on this. We've got the no evidence of demand issue, I think, if you read the briefing. What I would just say on that is that here, demand was an element of the contract. Demand was not a condition proceeding. I would analogize it to a demand note. If I owe you $100,000 under a promissory note that's a demand note, I owe it to you when you demand it. I don't owe it to you until you demand it or unless you demand it. And here, there are very strict provisions that require the type of notice and how it needs to be given for the demand to occur. There was no evidence of demand, no attempt to put that on, and so that's fatal to that part of the case. But I think the most important part here on the limitation of liability is the notwithstanding argument. And if you look at the contractual provision, I think it's paragraph 5 of the guarantee, says, notwithstanding anything else in this agreement, the guarantor won't owe more than the obligor. Yet the guarantor ended up owing $7 to $10 million more than the obligor would have, and the reason is because of the conversion rate to the NIRA. Now, our position is very direct, and I'll finish in 15 seconds, if you'll let me. It's very direct as between the two parties. Either the conversion rate read together with that limitation on liability means that it goes both ways, the conversion rate can hurt and harm SunTex as the guarantor, or read together with the guarantor protection of Texas law and that notwithstanding provision, that the provision could only benefit SunTex. If the rate of conversion went down, SunTex would owe less, but it could never in any circumstance owe more than the underlying obligation. And thank you for your time. Thank you. We have your argument, and you've saved two minutes for rebuttal. Thank you. Mr. Guy, sir. Thank you, Your Honors. I represent the Appellees, West African Ventures Limited and SunTex, and SeaTrucks Group, FCA. I'd like to start by giving a slightly more detailed overview as to what this case is about, because it needs to be placed in context. And all of this arises out of the chartering of vessels and the renting of equipment to support two offshore oil and gas projects in Nigeria. One is for Shell, and one is for another company called Conoil. Now, in the process of the Shell project, West African Ventures became concerned about the large amount of money it was owed by the company that had chartered its vessels, which is Ranger Subsea Nigeria Limited, and SeaTrucks Group similarly became concerned about the amount they were owed from Ranger International Limited. So here's what they do. They go to the parent company, which is Ranger Offshore in the United States, a party to the original litigation that has since disappeared and exists literally only on paper, and they also go to the money behind Ranger. These are the money men in Dallas, Suntex, who put the capital up for Ranger to do what it does. And they say, OK, we'll provide guarantees so that if the Ranger subsidiaries don't pay you, we will. And that is exactly what happened in this case, and that is why we are here, is that the underlying invoices were not paid, there's no dispute that they were issued, there's no dispute that they were properly payable, and the amount of them paced, Mr. Mead, has been calculated with precision. Instead, what we see here is Suntex concocting what can best be seen as hyper-technical defenses to try and avoid the deal that it has struck and avoid its guarantee on a technicality. And it's not really a technicality, it's sophistry is what that exercise is about. And that can be seen perhaps most clearly in their first argument, with regard to subject matter jurisdiction. Now, if we go to the original complaint on that, there it says West African Ventures Limited is a Nigerian corporation. Now, colloquially in Nigeria, that would be correct, because the Nigerians, and there's an affidavit to this effect from WAV's legal counsel, use the word corporation and company interchangeably. That's how they use it. But if we drill down to see what is this entity, it is a limited company. How does Nigeria come up with the concept of the limited company? Well, it looks to the former imperial power, namely the United Kingdom. And it has adopted English law when it comes to corporate structure and in terms of its justice system. It's not unusual, happens across the world. So the limited company in Nigeria is exactly the same as the limited company in England. They're just different places. And it was mentioned earlier that at some point it has been alleged that West African Ventures was a limited liability company, an LLC. That has never happened, because that entity doesn't exist in Nigeria or England. So if we assume, as the case is, that American courts would treat an English company, a limited company, in the same way that they would treat an American corporation for the purposes of diversity jurisdiction, that is how WAV should be treated in this case. And there's a couple of cases directly on point in our brief. The Landmark Capital case out of Arizona and the County of Orange case out of the Central District of California. Both of those involve companies that are listed as PLC. PLC in English law, that just means it's a publicly traded limited company. But other than that, it's the same thing. Now, why is the Nigerianness of this so important? Well, its lead counsel explained that. WAV has to be a 100% owned Nigerian limited company in order to comply with the Nigerian Content Act, a bit of local legislation that means that it is actually Nigerians who are doing the work in relation to the oil and gas business. But even if you treat it as an LLC, and I say that you should not, then WAV has met its burden of proof on that because it's put in all the evidence of that, including an untraversed affidavit to say all of the shareholders, everyone, everyone connected in any way whatsoever with this case, with this limited company, is Nigerian. And that has never been traversed. There was no deposition requested of Miss Ogbebe, the lawyer in Nigeria, to depose her and see if she came up to proof on that. And there is literally not a shred of evidence that WAV has any connection to Texas or Delaware that might defeat diversity jurisdiction. If you go on the website, and if you're in the business of chartering vessels in West Africa, I encourage you to do, the first thing you will see there is on the top right-hand corner, it says you're 100% owned Nigerian partner, and all of the corporate documents to support that statement have been provided and have never, ever been traversed. Ultimately, it comes down to the approach that Judge Bennett took on this as a duck test. If it looks like a duck, if it walks like a duck, and it quacks like a duck, it's a duck. The duck in this case being an American corporation for the purposes of diversity jurisdiction. But it's about as Nigerian as you get. And, you know, it's an interesting point that, although not dispositive of anything, that the United States District Court for the Southern District of Texas was the venue that was agreed to by Suntex in these guarantees. And the fact that they now try and worm their way out of that by raising this wholly bogus subject matter jurisdiction is actually indicative of their general attempt to avoid the obligations they've assumed. And we see that next in the agreed exchange rates. So here's how this works. On the Shell projects guarantee, there is an exchange rate set in that that will be 210 Nigerian Naira to one US dollar. And on the Conoil project, that goes up to 220 Nigerian Naira to the one US dollar. Why would you do this? The obvious answer is to hedge against currency fluctuation. Because if the value of the Naira goes down, then your guarantee is worth less. So Suntex is a sophisticated entity. It obviously understood the reasoning for that. And the conversion then is just simply a mathematical question. So Suntex claims, well hang on, that means we owe more than the primary obligor and it says right here that you can't do that. First, that's not true. It owes exactly the same amount, it just owes it in a different currency. And if it didn't like the fact that the guarantees were payable in dollars rather than Naira, it was free to make that point at the time these contracts were being drafted. Second thing they rely on is to say well this is a limited guarantee and if you look at section 5, it tells you here that notwithstanding anything to the contrary, liabilities, obligations, individually or collectively of the guarantor, shall not be greater than the liability and obligations of the contractor. Alright, fair enough. But that's followed by the next sentence, and accept as waived and acknowledge herein. Meaning, if you've acknowledged that you could own an additional liability if the dollar has risen against the Naira, well that's that should be enforced. Because if you say well we can't enforce this contract because it seems a bit unfair to them, that would dysfunctionally rewrite the entire contract and take out an agreed exchange rate that has been perfectly proper included, properly included within the contract and part of the bargain that was struck. You know, courts have often looked to this in determining where should we determine a what exchange rate should be applied when currencies have fluctuated. We've cited to the William McCrindle versus Durant case out of the Fifth Circuit, where it tells us the proper conversion rate is determined by the contract itself. Exactly so. We don't have to worry about timing here because we have a contract that tells us what the exchange rate is. So we don't have to worry about what the exchange rate was at the time of breach, at the time of judgment, at the time of trial or anything like that. It's to avoid all of that. Similar result in the case we cited of Society of Lloyds versus Abramson. I'd like to move on to the third issue and that comes to damages. And again, I think we haven't really had the full picture presented here. So to come up to prove our case on this, West African Ventures and SeaTrucks Group needed to pull together all of their invoices that have not been paid, that are the subject of the guarantee and present them through evidence saying these are our invoices and they haven't been paid. And they did that. They did that through their managing director Michael Amashiki, who was on the stand for several hours, went through the invoices, proved them all up and the total number. But, I went to law school... What is the point about that? Well, the point is that Mr. Mead has told you that the only evidence of damages comes from Mr. Arney. And that's not quite true because the factual basis for the evidence was put in earlier through Mr. Amashiki. Then we come to the calculation element, which involved math and a spreadsheet and things that I can't do, which is why I went to law school. So, Mr. Arney was retained to do that. And he presents a spreadsheet for the Shell project and he presents a spreadsheet for the Conoil project. And in both of those, he says, alright, here are the total amounts invoiced by WAV and STG to RSNL and RIL. Here are the amounts that have been paid, if any. And he used the wrong rate. Let me come back to that in a sec, because it's an important point. Then he says, this is the total amount outstanding, here's the interest, and now I've got to convert it into dollars. Now, the mistake he makes is on the Conoil project, right? Because the guarantee for the Shell project is 210 naira to the dollar. On the Conoil one, it's 220. And he used a different number and he used the same number for both. He used the number both. Some of us like math. Exactly. So, it's a simple mathematical mistake. Now, uh, Mr. Mead says, well, this was going to be our crucial cross-examination question, and we'd have just slayed Mr. Arney right there and then. You know, maybe, but I'm not sure that would have actually happened since they never asked to depose him, and I don't actually think they realized the error. No, it's that he used the wrong number and puts that in a footnote, and then puts the correct number into the judgment. Right, so when we... But why are we talking about this? Well, because they say that the evidence was improperly excluded, and I think what the answer to that question is, is the evidence was corrected so that it was accurate, right? Right. He didn't... The court didn't use the wrong report, which is what... I thought there was a citation to the wrong report. No, it did not. No, it's a citation to the correct report, but with a notation that it has an incorrect number in it, and then the court fixes the number. The court, in its final judgment, used the correct number from Mr. Arnold. Used the correct number and put in a footnote specifically noting that it has the wrong number in the report, doesn't it? I don't think that's quite correct. If it is, that's not what he meant. So, okay. So, is there ever a time that the court relies on the report that it's not supposed to? Well, you know... Help me. As an officer of the court, I'm asking you, is there any evidence in this record that the court relied on the report that it was not supposed to have relied upon based upon its ruling? No, Your Honor. It is relying on the corrected number, because that's another point with regard to correcting this one error in Mr. Arnie's report, is that I suppose we could have gone forward with the original report and hoped that nobody noticed, because it actually inures to our benefit. It's more money. But, I wouldn't do that, because that would be unethical and improper. And drawing that sort of error to the attention of the court is obviously the correct thing to do. And it's not like there's a great deal of prejudice, or any prejudice for that matter. It's just a simple correction of a mathematical error. And is it your position as an officer of the court that the amount in the judgment is the actual correct contractual rate? Yes, Your Honor. Okay. Did you want to proceed with any other points you wish to make? Mr. Meade says he's never actually calculated what the correct number is. Well, if that's true, shame on him. Because you'd have thought you'd want to figure it out. But that's actually indicative of the reality of the situation, is that everybody accepts Mr. Arney's figures as he's calculated them when corrected. Because there's no other expert beforehand to say, actually, the amount should be this. So, the way this was dealt with by Judge Bennett was a little unsatisfactory in that we saw it really as just correcting a mathematical error and one that didn't cause any prejudice at all. But the way that came around was that he was still allowed to testify to the correct figure because otherwise you'd be in the slightly bizarre position of instructing a witness to testify to something we've all just established and in fact admitted is not true. So, if you take a step back from this and look at it in a practical way, what's the purpose of an expert on damages who's functionally forming the role of a human calculator? And the answer to that is for him to get to the correct number. And that's what he did. He made one mistake, he fixed it, and then we got to the correct result. And that really is the result that we should be reaching in this case. The last point that I would cover is the allegations with regard to demand for payment. And Suntec's position, as I understand it here, is that neither WAV nor C-Trux Group have actually ever presented any evidence of demand for payment. One would have thought that the lawsuit might itself be seen as a demand for payment, since lawsuits usually are. But leaving that aside, most importantly this argument fails procedurally because the way this case unfolded shortly before trial is that WAV and STG moved to summary judgment on their claims, and Judge Bennett announced to the court that he was granting our summary judgment as to liability, and he was granting it as to the enforceability of the exchange rate. But he was leaving open, as fact questions, the issue of damages, and another extremely esoteric issue of what the interest rate was and what the meaning of LIBOR plus 9%. So those were the issues left over. But in the briefing that preceded that summary judgment, on no occasion did Suntec ever say, well, there's no presentment here so your case fails. In fact, Suntec didn't even file a brief in that beyond filing a Me Too with regard to Ranger's brief. And Ranger's brief, in opposition to the motion for summary judgment, never contested liability. So, we had a summary judgment pending. That was granted. And now, after the event, Suntec tries to come in with some new arguments about presentment to say that it presentment was never made, even though they never raised those. And by not raising those, we would say WAV'd them. We'd say they WAV'd them. I believe that's pretty clear on the Fifth Circuit. The Gilley Court out of the Fifth Circuit from 1994 says an argument is WAV'd if the party fails to make an argument in response to summary judgment. Here, that's exactly what happened. In the Skotak v. Tenneco Fifth Circuit case from 1992, here again, although on summary judgment the record is reviewed de novo, this court, for obvious reasons, will not consider evidence or arguments that were not presented to the District Court for its consideration in ruling on the motion. So, these were never presented. And this is yet another attempt from Suntec to start digging out new and exciting excuses as to why it shouldn't be forced to pay on a guarantee that it freely entered into. Mr. Peck, can you go back to the jurisdiction point? Yes, ma'am. What do you believe is the cleanest approach? The cleanest approach on this is to say that a limited company from the Republic of Nigeria, which is based on English law, has all of the attributes of a limited company from England, from which, after all, corporate law as we know it is derived, and to say that a limited company should be treated the same as a corporation for the purposes of diversity purposes. And courts have said that. Thank you. The alternative issue on that would seem to say that you should treat a foreign entity as an LLC and therefore have to plead the citizenship and proof and state of the members. That's really trying to put a square peg into a round hole. Because if you're asking what's it most similar to, it's plainly a corporation. And then if you start trying to compare it to an LLC, you'll be asking to look for lots of attributes that a limited company simply wouldn't have. Because the limited company in England or Nigeria or any other common law jurisdiction, Canada, Australia, is most similar to the corporation in both its form, its function, and its identity. And that holding would be consistent with how other courts have treated those entities for the purposes of diversity jurisdiction. As an officer of the court, are you aware of authority to the contrary? I know that there's no binding authority on us in this because it's not, you're citing these California authorities. No. I have come across literally no cases that say, to the contrary, an English limited company should be treated as an LLC. I have located not a single case on that. I have located several cases where courts have held that it should be treated as a corporation. And a number of cases that were referenced in the original briefing but not in the appeal brief, where it's functionally assumed that that would be the case because the parties aren't trying to concoct arguments in order to evade their contractual obligations. Thank you. I have your argument. Mr. Meade, you've saved two minutes for rebuttal. Thank you, judges. On the first point, there's at least one distinguishing difference between the limited company and a corporation, and that is the ability to create that pledge, either to pledge your shares or to give a monetary pledge to back those shares. So it's not a corporation. And with all due deference to my opposing counsel, the cases that he cites that hold that a limited company under, for this law, is a corporation made the assumption that it is. None of them performed an analysis to determine whether it actually was. So that analysis hasn't been done that we could find by any U.S. court to see whether a limited company. And a British limited company and a Nigerian limited company are a difference in at least that respect of the pledge, which is more similar, like I said, to a partnership than it is to a corporation. I want to bring up a couple other points because you raised the question about whether there is anything that shows that Judge Bennett relied upon the wrong report. Okay. So he didn't just exclude the report. He excluded the testimony based on it. And if you'll look at the, I think it's Exhibit 6, but anyway, the trial record, I objected to the admission of testimony or the report that was late provided. Pardon me? Footnote 62 very carefully says what he relied upon and what he didn't. I understand. But the problem is footnote 53 says that the expert testified, expert Arnie testified to those numbers. Right above the footnote, Judge. That's what it says. If you look at the footnote, Arnie testified to it. And if you'll look at page 24 of the trial brief, Judge Bennett says, this court will be limiting its review of this expert's opinion to the opinion that was disclosed in the original report filed in September. The problem is footnote 53 isn't the original report. That's not the numbers from the original report. That's the numbers that were in the supplemental report that was excluded and the testimony that he gave only for the record on appeal. Unfortunately, the year lapsed. The judge went back and resurrected that testimony. I did blow my time on that one question. Thank you. Thank you. Counsel, we appreciate the arguments today and we appreciate your cooperation in trying to keep an appropriate socially distant courtroom so we could be here together in person. This case is submitted and the court will stand in recess until 1 p.m. when it considers its next argument of the day. Thank you very much.